**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**

_____

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 1:17-cr-00248-TSE |
| | ) | |
| HYUNG KWON KIM, | ) | Sentencing: January 25, 2018, 4:00 p.m. |
| | ) | |
| Defendant. | ) | |

_____

**DEFENDANT'S SENTENCING MEMORANDUM
IN SUPPORT OF A SENTENCE OF PROBATION**

MATTHEW C. HICKS
Virginia Bar Number 48377

MARK E. MATTHEWS

CAPLIN & DRYSDALE, CHTD.
One Thomas Circle, N.W., Suite 1100
Washington D.C. 20005
Telephone: (202) 862-7852
Facsimile: (202) 429-3301
E-Mail: mhicks@capdale.com
*Attorneys for Hyung Kwon Kim*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

THE PLEA AGREEMENT ................................................................................................. 3

RELEVANT FACTUAL BACKGROUND........................................................................ 5

    I.       Personal Life ......................................................................................... 5

    II.     Business Life.......................................................................................... 8

    III.    Charitable Foundation and Other Donations .................................... 10

    IV.    The Offense Conduct ......................................................................... 12

    V.     Financial Penalties ............................................................................. 14

ARGUMENT ...................................................................................................................... 14

    I.       The Nature of the Offense & the History and Characteristics of the
            Defendant............................................................................................ 16

          a.      No history of Criminal Activity.................................................... 17

          b.      A Business Life, Contributing to the Employment of
                 Thousands and to the Economy .................................................... 17

          c.      Cooperation.................................................................................... 18

          d.      Contributions to Education of Many Dozens of Deserving
                 Students......................................................................................... 18

    II.     The Purpose of Sentencing ............................................................... 18

          a.      The Prospects of Additional Incarceration Related to Possible
                 Deportation ................................................................................... 20

          b.      The *U.S. v. Gabella* precedent suggests a sentence of probation
                 in this case is appropriate .............................................................. 25

    III.    The Kinds of Sentences Available...................................................... 26

          a.      A Sentence of Probation is Appropriate ....................................... 27

    IV.    The Sentencing Guidelines ................................................................ 27

    V.     Pertinent Policy Statements ............................................................... 28

VI.     The Need to Avoid Unwarranted Disparities among Similar Offender ..................... 28

VII.    The Need to Provide Restitution to Any Victims of the Offense ............................... 34

VIII.   A Sentence of Probation is Appropriate ...................................................................... 34

CONCLUSION ............................................................................................................................. 35

# <u>INTRODUCTION</u>

Defendant Hyung Kim comes before the Court for sentencing after having pled guilty to a single count of failing to file a Report of Foreign Bank and Financial Accounts (hereinafter "FBAR") in violation of Title 31, United States Code, Sections 5314 and 5322(a), and Title 31, Code of Federal Regulations, Section 1010.350. Mr. Kim submits the following sentencing memorandum to assist the Court in determining an appropriate sentence pursuant to 18 U.S.C. § 3553(a).

Under the plea agreement filed in this case (see pp. 3-5), for reasons of fairness described in that agreement and summarized below, the government and Mr. Kim agreed to jointly recommend to the Court that the offense level under the sentencing guidelines should be treated as 15 in this case which provides for a sentencing range of 18 to 24 months. The government is also filing a motion pursuant to Section 5K of the guidelines recommending a 50% reduction from the 18 months for a sentence of 9 months based on the defendant's substantial assistance in the investigation and prosecution of others. [1]

The defense submits that the appropriate sentence for Mr. Kim is probation for the following principal reasons:

- Mr. Kim has accepted responsibility as reflected in his nearly immediate agreement to plead guilty when this investigation began five years ago and his very significant financial payments, penalties and restitution, making the IRS and Connecticut whole. At the time of sentencing, Mr. Kim will have paid over $14 million in FBAR penalties and in excess of $244,000 in back federal and state taxes due to interest and

---

[1] A separate memorandum is being filed today, under seal, providing details concerning Mr. Kim's substantial assistance to the government.

other adjustments, having filed amended federal tax returns for 2003-2010 and FBAR forms for 1999-2011. These financial penalties are over *57 times* the tax loss in this case, a heavy penalty already incurred;

- Mr. Kim has cooperated for a span of over five years with the government and such cooperation has resulted in a detailed sealed 5K motion filing by the Department of Justice;

- In offshore cases such as this, Courts have imposed sentences with downward variances in extraordinarily high volumes – in 99% of the cases – even where there is no 5K motion and even though these cases usually involve million dollar and higher accounts. These variances in offshore cases are often substantial, averaging a reduction of over 83% from the bottom of the guideline range. The most common sentence, by far, has been probation, which has occurred in *55% of all offshore cases*, in many instances with a combination of home confinement and/or community service.

- In cases that involve the issuance of a 5K motion, periods of incarceration are even rarer, and variances are even more robust. In the cases we have identified where a 5K motion was filed, sentences of probation are the most frequent result, occurring in 67% of all cases, and even when periods of incarceration are imposed, they are often exceedingly short with 80% of sentences including 2 months of jail time or less. In most offshore cases involving cooperation, the cooperation appears to be less significant than that provided by Mr. Kim; many appear to be based on providing information in interviews and offers to testify if needed.

- Mr. Kim is a permanent resident of the United States, and he is therefore subject to deportation proceedings with an uncertain period of additional mandatory detention and potential eventual deportation – significantly punitive collateral outcomes of his conviction which the Court is permitted to take into account in sentencing. In an analogous case, *US. v. Gabella, even though there was no 5K motion,* the Court sentenced Mr. Gabella to a term of three years of probation, given the prospect of deportation.

When all of the above factors are considered, along with Hyung Kim's exemplary life concerning his family, the origins of his offense, his contribution to the economy of his adopted home – the United States – through substantial investment of funds he inherited in Korea, his charitable giving and the potential for protracted incarceration in deportation proceedings, we respectfully submit that a sentence of probation is the most appropriate sentence which satisfies all the objectives of sentencing. [2]

## <u>THE PLEA AGREEMENT</u>

The parties agreed for reasons elaborated in the plea agreement, subject to the Court's approval, that Mr. Kim's offense level, before applying any reductions for acceptance of responsibility, should be considered to be eighteen (18). We submit that a three-level reduction for acceptance of responsibility is appropriate, two by application of the guidelines and then one if the Court grants the government's anticipated motion pursuant to U.S.S.G. §3E1.1(b). If the Court agrees with the parties' plea agreement and attendant computations, Mr. Kim's total offense level would be considered to be 15, resulting in an advisory Guideline range of 18-24

---

[2] If the Court concludes that some loss of liberty is required in this case, the defense respectfully suggests that a period of restricted home confinement would serve that purpose without triggering significant deportation-related incarceration in a county jail type facility and possible deportation. See discussion below.

months (Criminal History Category I) prior to the Court's consideration of an anticipated government motion pursuant to Sentencing Guidelines Section 5K1.1. Of course, the advisory Guideline range is but one factor to be considered in determining a sentence that is "sufficient, but not greater than necessary." *See Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (*quoting* § 3553(a)).

We note the Presentence Report ("PSR") calculates an offense level of 27, by applying Guideline subsection 2S1.3(b)(2), implicitly rejecting the application of cross reference in section 2S1.3(c). In basic terms, the PSR interprets the guidelines as requiring a guideline focused on the size of the unreported bank account. However, as the government very fairly and professionally noted in the plea agreement, it has heretofore interpreted this guideline as allowing a cross reference to the tax guideline – meaning that previous similarly situated defendants have been effectively sentenced on the tax loss generated by their conduct, not the size of the bank account. Accordingly, in the plea agreement, the government and defendant have agreed to jointly recommend to the Court the same guideline for Mr. Kim in light of the fact that for at least the last five years, the government and dozens of federal district courts have been interpreting this guideline in similar cases as being governed by the cross reference in Section 2S1.3(c) to the Tax Table. In the past, when defendants have pled guilty to a single FBAR violation, and there have been approximately 23 such cases and applications subsequent to the Mr. Kim's agreement to plead guilty, the tax cross reference has been applied. In light of the fact that the defendant agreed to plead guilty five years ago and would have received the prior guideline interpretation but for events beyond his control and caused in part by his extended period of cooperation, the defendant respectfully requests that the Court "grandfather" his case and either apply the cross reference directly or in the alternative, grant a variance from

4

offense level 27 to 18 (prior to the reduction of points for acceptance of responsibility) based on the plea agreement and the fairness the government accorded Mr. Kim in that agreement.

## RELEVANT FACTUAL BACKGROUND

### I.      Personal Life

Although he grew up in a privileged environment as the only child of a self-made successful entrepreneur in Korea, Hyung sought a future for himself and his family in the United States where they would be less constrained by the more restrictive familial hierarchical tradition in Korea.  Eventually, Hyung would succeed in building on his father's business legacy and creating several successful enterprises – not in Korea, but in the United States -- by transferring his substantial inheritance from Korea to the United States.  His clothing business supplies to well-known brands such as Brooks Brothers, Men's Warehouse, and Tommy Hilfiger, just to name a few.  Thousands of people around the world work as employees or as contractors to Hyung's businesses which supply both men's and women's wear in many levels of distribution. He is nearing forty years of marriage – an arranged marriage as was customary for his generation -- and his children have excelled in school and have moved on to careers of their choice.  He is expecting his second grandchild.

Hyung was born in 1955 in Seoul, Korea.  He was an only child born to Korean parents in a very traditional Korean family, resulting in all the familial responsibilities to his parents falling on his shoulders for the rest of their lives.  Shortly after Hyung's birth, his father launched a business manufacturing men's suits in Korea.  His father's business was very successful and included retail sales of suits as well.  As a traditional Korean father, he expected Hyung eventually to take over the family business as is so common in Korean culture.

Hyung began to prepare for a career in business, first graduating from the Seoul National University in 1978. Hyung met his companion for life – through traditional match making – and was married in 1981. Shortly thereafter, he and his wife came to the United States in order for Hyung to obtain a Master's Degree in Business Administration from the University of Washington in 1983.

As all in the family expected after his U.S. educational experience, Hyung returned to Korea and began working in his father's business. Things did not go as planned and as Hyung's father expected. Hyung was under his father's complete control, particularly when it came to finances. The letters submitted to the Court, particularly those of Hyung's wife and youngest daughter, describe Hyung's challenges with respect to his relationship with his father.

Eventually, Hyung decided to seek out a freer future for himself and his family. In 1995, he decided to move to the United States with his family. The Kims moved to Massachusetts where he enrolled and completed an executive fellowship program at MIT. Notwithstanding the "escape" from Korea, Hyung was confronted with the fact that he and his family remained completely dependent on his father's financial support. Hyung thus went back to working for his father in the United States. From the late 90s through the first decade of the 21st Century, Hyung was heavily dependent on his father's financial support, which enabled him to continue to reside in the United States with his wife and three children.

It is noteworthy that even in his son's absence from Korea, Hyung's father continued to run Hyung's financial life at his sole discretion as he did all of Hyung's life. He continued to file Hyung's Korean tax returns and continued to transact banking and businesses in Hyung's name without telling Hyung. For instance, without consulting Hyung, he sold the apartment where Hyung had been living in Korea and notified him afterwards that he had done so. Hyung's father

was able to legally control and manage all aspects of Hyung's financial life through the use of Hyung's registered stamp which his father maintained at all times, a custom that is not unheard of in Korea. The registered stamp had the same legal effect as an original signature in Korea.

In 1998, during this period when he was completely dependent on his father, Hyung's father asked him to open an account in Switzerland to move monies that were in Hong Kong. Hyung complied with his father's wishes. From Hyung's perspective, he felt compelled to do his father's bidding, not only because he and his family were completely dependent on his father, but it was also a chance to redeem himself in his father's eyes as his father had frequently expressed his disappointment in Hyung's decision to move away from Korea. This was all compounded by the fact of Hyung being an only child; there was no one else to fill this void in his father's expectations and desires.

At this point, Hyung did not view the funds to be deposited in Switzerland as his money, but he complied with his father's demand. We want to be very clear that as the facts below demonstrate, Hyung eventually came to own those funds and he would commit crimes in connection with the Swiss accounts to protect those funds from being disclosed to the United States government. He is taking full responsibility for his illegal conduct. However, it is also clear that had his father not asked him to open the accounts in Switzerland, Hyung would never have conceived any such plan to evade his tax or other reporting obligations in the United States.

After Hyung opened the Swiss accounts in this case, he eventually moved the family to Connecticut. He and his wife raised very accomplished children. When the children were accepted at schools like Princeton and Wellesley, the Kims were fortunate enough to be able to afford these institutions, and the children have all become productive citizens.

## II.     Business Life

As noted earlier, Hyung's father had wanted Hyung to take over the businesses that he had built in Korea, and Hyung had refused.  Instead, Hyung left Korea over two decades ago with his family to start a new life in the United States.  In or about 2007, after being convinced that Hyung would not return to Korea, Hyung's father decided to sell the businesses that he had built in Korea.  The proceeds exceeded $30 million.

In 2009, Hyung's father fully disclosed to Hyung about monies that Hyung was to receive from his father which were primarily the proceeds from the sale of the businesses.  In a watershed moment for Hyung, his father further told him that he could now determine for himself what to do with this money in Korea from the sale of the business.  Hyung responded that he wanted to bring all of those funds to the United States.  His father permitted him to do so. These monies were transparently moved to the United States and used to invest in businesses in the United States.  To his now profound regret, he did not do the same with respect to the funds in Switzerland.

This transfer of the proceeds of the sale of the Korean businesses to the United States allowed Hyung to build on his father's business legacy by creating several successful business enterprises in the United States.  As noted earlier, thousands of people around the world work as employees or as contractors to Hyung's businesses which supply both men's and women's wear to wholesalers and retailers.  One of these companies, Cimexlana USA, LLC employs close to a thousand workers at the mill in Mexico and sells to known men's wear brands like Brooks Brothers, The Men's Warehouse (previously, also, Joseph A. Banks) and Tommy Hilfiger. There is an additional factory in Mexico and others in Guatemala and in Vietnam which

collectively employ thousands of workers.  The function of these other factories is to supply almost exclusively to the clothing businesses owned by Hyung.

Another of Hung's companies, SPC Global, LLC ("SPC") is a New York entity located at 1270 Broadway, New York and is currently highly profitable in ladies' wear business.  For the year 2016, SPC had gross sales of over $70 million, resulting in ordinary business income of over $9 million.  Also, Hyung runs BK House, LLC ("BK House") which is also located in New York City.  For the year 2016, its total taxable income was $1.7 million.  It is engaged in a retail men's clothing business and conducts the business under the name "My Suit."  My Suit has five retail outlets, three in New York City, one in Philadelphia and one in Westchester, New York.

Hyung and his wife Soo also own CNA Cornerstone which owns a commercial property in Manhattan near the garment district.  Hyung's businesses are headquartered in the building which also leases out offices for rent.

Since 2012 when he was served with a grand jury subpoena and he agreed to cooperate with the government, Hyung's overseas travel has been curtailed, and he has faced an uncertain future.  As such, he has put expansion and investment plans for his businesses on hold.  For example, his My Suit business – which sells partially custom tailored suits at pre-made suit prices – could be franchised or duplicated in cities throughout the United States and the world.  Once Hyung pays his debt to society as a result of his conduct in this matter, he intends to devote himself fully to managing and expanding BK House and My Suit business nationally and internationally, which will hopefully contribute to the economy and even more jobs domestically and globally.

## III.     Charitable Foundation and Other Donations

As is demonstrated by the Kim family educational experiences described above, education has been important to this family.  Hyung himself was fortunate to attend outstanding educational institutions in both Korea and the United States and has seen his children do the same.  The Kim family, starting with Hyung's father, has also assisted others in obtaining the education designed to achieve excellence.

In approximately 2000, Hyung's father, Sam Suk Kim, founded the Jeongsong Cultural Foundation in Korea.  He generously funded that foundation with the gift of half of a significant building and the resulting income stream from the rents of that building.  The Foundation's original focus was to offer scholarships to Korean college graduates who hoped to obtain graduate education in the United States, but who could not afford it.  From 2003 to 2015, the Foundation spent over $7 million in scholarships, usually to some of the most elite graduate schools in the U.S., such as Stanford and MIT.  Hyung supported his father's efforts and the generous gift of the family assets, even though these assets would have been inherited by him if not used for charitable purposes.[3]

After the elder Kim's death, Hyung and Soo shifted the programmatic emphasis of the Foundation and began to focus on providing scholarships to Korean high school graduates who could not afford to attend colleges and universities in Korea.  The prior practice of providing scholarships to the "best and brightest" to attend the elite institutions in the United States had an impact on not only those selected scholars but on society and the economy where they have gone on to become part of an elite workforce.  However, Hyung and Soo sought now to help those

---

[3] We are including among the character letters a translation of one of many testimonials from scholarship recipients which can be found on the Jeongsong Foundation website, http://www.jeongsong.co.kr/.

students who were often living under dire financial situations and for whom education beyond

high school was beyond their reach. As a recipient, a student is supported for the entire four

years at the university by the Foundation. The Director of Scholarship at one of the girl's high

schools writes:

> My students, Soojin Park and Gayoung Suh, who are the 2016 selected recipients
> of the Jeongsong Cultural Foundation scholarships, now have no shadows or
> anguish on their faces, and with sparkles in their eyes, are pouring all their energy
> into studying hard. All the teachers at the school feel their hopes and energy, and
> on behalf of all the teachers, I would like to thank the Foundation.[4]

In 2017, the Foundation offered college scholarships to 49 high school students with

financial need and who had demonstrated a commitment to community service.

In addition to the Foundation, we also note that Hyung had made continuous charitable

contributions over the years to educational institutions. He contributed

- $1,000 to Bowman Elementary School;

- Approximately $150,000 to Deerfield Academy;

- Approximately $70,000 to Concord Academy;

- Approximately $680,000 to Princeton University (of which approximately $600,000
  was to the Ecology and Evolutionary Biology Department); and

- Approximately $50,000 to Wellesley.

In addition to support through the Foundation and his personal giving to the educational

institutions, Hyung has been generous in other ways. As an example of his generous spirit, he

fully paid for his nephew's education at John's Hopkins and Cornell University.

---

[4] A courtesy copy of all letters submitted to the Court are being hand delivered to chambers with this filing. They
are also being supplied to the government and the pre-sentence investigator.

Hyung's giving history and the many anecdotes of his generosity which are contained in the letters submitted to the Court all portray Hyung as someone who has been kind and generous all his life.

## IV.    The Offense Conduct

As indicated above, Hyung's involvement with foreign accounts began with a request from his father to assist him in opening a Swiss bank account to hold his father's funds.  Initially, and for years thereafter, Hyung never thought of the funds in the accounts as his, so he did not believe that his involvement with these foreign accounts was depriving the US treasury of tax funds.  However, as his father got older, he eventually made it clear to Hyung that it was the elder Kim's intention for Hyung ultimately to own the funds in the Swiss accounts.

Hyung engaged in a series of bank transfers and other financial transactions over the ensuing years that were designed to conceal these accounts and the funds therein from the US government and worse, to allow him to use the funds in the United States while avoiding his reporting and tax compliance obligations.

As described in the Statement of Facts, from the very beginning when he opened the Swiss bank accounts, the accounts had all listed Hyung as the owner on the critical Swiss bank Form A indicating beneficial ownership.  Although Hyung initially thought of the funds as his father's, Hyung later began to use some of the funds for himself and eventually understood that his father intended for him to have all the funds remaining in the Swiss accounts.  Hyung understood then that if he claimed the accounts and reported them, he would reveal to the US government a significant asset and tax liability.  Unfortunately, he chose to continue to conceal the accounts and funds, continuing the pattern he started with his father when he opened the accounts.  Then, when the Swiss bankers and professionals warned him that these accounts could

be discovered by the U.S. government, he readily agreed to establish trusts in order to interpose another layer of concealment. This basic scheme is common among the many tens of thousands of U.S. citizens who disclosed such accounts through the IRS Offshore Voluntary Disclosure Program.

When Hyung began to use the funds for his own benefit in the United States, he paid off the mortgage on his home, purchased a multimillion dollar vacation home and bought expensive jewels, among other things. In connection with all of these expenditures, Hyung worked with Swiss bankers and a Swiss lawyer to conceal the nature of the transactions. He used the foreign trusts to transmit the funds and engaged in a scheme to purchase jewels in the United States and to pay a Swiss jeweler for the jewels from the Swiss accounts. When Hyung was advised by Swiss professionals – a banker and lawyer – to close the accounts, he accepted their suggestion to use the jewel purchase device to empty the accounts by purchasing several extremely expensive jewels.

The Statement of Facts in this case provides extraordinary detail of the various accounts, the dates of opening and closing and significant transfers. It provides the high balances of the various accounts. Mr. Kim had acknowledged that the facts in the Statement of Facts are true, and he has accepted responsibility for engaging in a multi-year, multimillion dollar scheme to conceal these assets given to him by his father.

It is perhaps a small irony, but we note that Hyung was hardly a successful investor. In accounts containing as much as $28 million, Hyung's investments resulted in so little investment income that the combined federal and tax loss related to the Swiss accounts in this case was approximately $244,000. So all of the elaborate concealment in the end gained him almost nothing in additional income in relative terms. And further, under U.S. tax law, he would have

owed no tax on his receipt of the inheritance from his foreign father; he merely would have had to file an information return with the IRS. Yet as a result of his criminal conduct, he has paid half the account at its highest previous point as a penalty. Notwithstanding his pattern of concealment, Hyung Kim acknowledged his guilt as soon as the government contacted him and immediately offered to plead guilty and cooperate. He has accepted responsibility for his actions, and he will live with the consequences of his conduct for his lifetime.

## V.    Financial Penalties

Prior to sentencing, to summarize the payments above, Hyung will have paid a $14,075,862 FBAR penalty and federal and state taxes in excess of $244,000 due to interest and unrelated adjustments.

Hyung's combined payments of penalties and taxes exceed the federal taxes actually due in the years at issue by a multiple of over 57 times. Moreover, the lowest guideline fine in this case is $12,500, so the payments and penalties imposed in this case already exceed that figure by over one thousand (1000) times.

These payments reflect Hyung's extraordinary acceptance of responsibility, and the public reporting of these enormous financial penalties has already created and will continue to generate a significant deterrence message. Indeed, the government enforcement approach in these cases emphasizes the financial sanction in this case – with the penalties so many multiples in excess of taxes due and guidelines provisions -- and we urge the Court to give significant weight to that.

## ARGUMENT

Since *Gall v. United States*, 552 U.S. 38, 50 (2007), Guideline ranges are no longer presumed reasonable, federal sentencing is based on individualized assessments, "extraordinary

circumstances" are no longer required to justify a sentence outside the Guidelines' advisory range, and rigid mathematical formulas to determine whether a variance from the Guidelines' sentence range is justified are discouraged. *Id.* at 47.

Accordingly, after calculating the proper offense level under the Guidelines and giving the government and the defense the opportunity to argue for the sentence they believe to be appropriate, district courts have "broad discretion to impose a non-guideline sentence by weighing the § 3553(a) factors" and a sentence is "tailored" to fit the circumstances of the case. *United States v. Booker,* 543 U.S. 220, 245 (2005); *United States v. Robertson*, 662 F.3d 871, 875 (7th Cir. 2011). The § 3553(a) factors include:

(1)     the nature of the offense and history and characteristics of the defendant;

(2)     the purpose of sentencing;

(3)     the kinds of sentences available;

(4)     the Sentencing Guidelines;

(5)     the policy statements issued by the Sentencing Commission;

(6)     the need to avoid unwarranted disparities among similar offenders; and

(7)     the need to provide restitution to any victims of the offense.

This case exemplifies why the Supreme Court rejected mandatory and mechanical application of the Sentencing Guidelines and restored district courts' discretion "to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Pepper v. United States*, 131 S.Ct. 1229, 1239-40 (2011) (internal quotations and citations omitted). Cases often present unique, and at times unprecedented, facts and circumstances that sentencing courts consider with care and discretion in fashioning an appropriate sentence.

We submit that application of § 3553(a) factors to this case leads to the conclusion that a sentence of probation is appropriate. This case is out of the heartland of criminal tax cases with similar guidelines ranges, and the § 3553(a) factors illustrate why probation is a punishment "sufficient, but not greater than necessary, to comply with the statutory goals of sentencing." *Kimbrough*, 552 U.S. at 109.

## I.     The Nature of the Offense & the History and Characteristics of the Defendant

Hyung stands by his plea; he acknowledges his guilt, and nothing in this section is intended to diminish the wrongfulness of what he did. It was a knowing and willful violation of law occurring over many years and ultimately involving financial accounts that exceeded $20 million. However, Hyung's efforts to cooperate with the government; the results of that cooperation to date; his payment of over $14 million in tax, interest, and penalties (or over 57 times the taxes due); and his full acceptance of responsibility are highly relevant to the nature of his offense.

There is no denying the seriousness of what he has done or that Hyung compounded this error with each year's tax return and his failure to report the Swiss accounts and to pay taxes on any income earned in them. But Hyung's history and character lead to one conclusion – the crime to which he pled guilty is an aberration in an otherwise law-abiding life, one full of contributions to his family and employees and community. His wrongful conduct stands in stark contrast to six otherwise exemplary decades. There is simply no doubt that without his father's request to help him in opening these foreign accounts and Hyung's psychological need to assist a father he had disappointed in so many ways, Hyung's life would have remained uneventful, successful and lawful. One court aptly summarized the importance of the consideration of a defendant's history and characteristics as part of the analysis under § 3553(a):

But, surely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is common to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, "the history and characteristics of the defendant."

*United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006), *aff'd* 301 F. App'x. 92 (2d Cir. 2008). Keeping these principles in mind, we urge the Court to consider the following indisputable facts, and what those facts say about Hyung:

a.      *No History of Criminal Activity*

This is Hyung's only criminal offense in his life. We submit that his conduct in this case amounts to a contained series of events constituting a single exception to an otherwise law-abiding life. *See id.*; *United States v. Suarez-Reyes*, No. 8:12CR67, 2012 U.S. WL 6597814, at *7 (D. Neb. Dec. 18, 2012); *United States v. Rowan*, No. 06-321, 2007 WL 127739, at *8 (E.D. Pa. Jan. 10, 2007) (imposing sentence of probation with home confinement for mail fraud conviction based on defendant's history and isolated nature of crime in that history).

b.      *A Business Life, Contributing to the Employment of Thousands and to the Economy*

As described above, Hyung successfully transferred to the U.S. and then expanded the business he essentially inherited from his father. He now operates multiple business enterprises in four countries employing thousands of individuals. He has plans to expand these businesses, but he has held those plans in abeyance pending the resolution of this matter. While it is certainly true in many criminal cases that a defendant's family and businesses/employees suffer, we ask the Court to consider all the circumstances of this case and provide for a sentence that allows Hyung to promptly implement his plans with minimal disruption to the company and his employees.

c.    *Cooperation*

The extent of Hyung's cooperation efforts are discussed at length in a sealed memorandum accompanying this filing.

d.    *Contributions to Education of Many Dozens of Deserving Students*

As described above, Hyung continued the family foundation and its efforts to assist worthy students for graduate and now college study.  Although his father initially created the Foundation, Hyung was supportive, and he and his wife redirected the Foundation's efforts away from elite graduate education to college education by students demonstrating need and commitment to community service.   We also note that Hyung had made a few significant charitable contributions over the years, including almost $700,000 to Princeton.

## II.    The Purpose of Sentencing

Each sentence imposed under the Guidelines should be determined based on the relevant facts and circumstances, and designed:

(A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B)    to afford adequate deterrence to criminal conduct;
(C)    to protect the public from further crimes of the defendant; and
(D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

We respectfully submit that in light of all of the circumstances in this case, an incarcerative sentence is not necessary in this case to "reflect the seriousness of the offense" or "to promote respect for the law."  It is of course true that if people did not believe that there were punitive consequences for breaking the law, they might feel more unencumbered in doing so. The Supreme Court has explained, however, that this calculation does not always lean towards a custodial sentence.  "A sentence of imprisonment may work to promote not respect, but derision,

of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." *Gall*, 552 U.S. at 54. The indictment and collateral consequences, including the very large FBAR penalty and press accounts about these proceedings, already convey the seriousness of, and provide significant punishment for, this offense. Moreover, Hyung demonstrated early and complete acceptance of responsibility for his conduct, confirming his remorse and his respect for the law, the government and this Court. *See United States v. Pauley*, 511 F.3d 468, 474 (downward variance of 36 months justified in part because defendant was "deeply remorseful"); *United States v. Gardellini*, 545 F.3d 1089, 1095 (D.C. Cir. 2008) (downward variance to sentence of probation for I.R.C. § 7206(1) offense justified in part because defendant "cooperated with authorities and accepted responsibility for his crimes").

Furthermore, there is no evidence showing that recidivism is a concern. *See United States v. Smith*, 275 F. App'x 184, 187 (4th Cir. 2008) (downward variance of 54 months was justified in part because of a low risk of recidivism); *United States v. Roth*, No. 05 CR 792-5, 2008 WL 686783, at *3 (N.D. Ill. Mar. 11, 2008) (departing from guidelines range of 63 to 78 months to probation on charge of making materially false statement to the FBI due, in part, to defendant's sincere remorse and absence of criminal history, all indicating no threat of recidivism). There is no reason to believe prison time is necessary to prevent him from engaging again in the concealment of foreign accounts again. As indicated above, however, if the Court determines that some loss of liberty is required to ensure just punishment in this case, the defense urges the court consider a sentence of probation accompanied by a condition of restricted home detention.

Finally, a term of incarceration is not required to provide Hyung with "needed educational or vocational training, medical care, or other correctional treatment."

a.     The Prospects of Additional Incarceration Related to Possible Deportation

Another factor relevant to just punishment in the case of non-citizens is the possibility of deportation and the potential significant incarceration periods attendant deportation proceedings. Hyung Kim has been in the United States as a lawful permanent resident alien for over 20 years. His wife and children are U.S. citizens and their lives are tied to this country.  His status as a convicted felon, however, puts him at significant additional risk at the time of sentencing – both for additional incarceration and potentially deportation.  Deportation is an integral part—indeed, sometimes the most important part—of the penalty that may be imposed on noncitizen defendants who plead guilty to specified crimes.  *Padilla v. Kentucky*, 559 U.S. 356, 364 (2010).

In imposing "just punishment" for a particular offense, we urge the Court not to ignore the additional penalties and hardships that will attach as a result of conviction.  It does not matter whether the consequences of conviction are categorized as "direct" or "collateral." *See Padilla*, 559 U.S. at 366 ("Deportation as a consequence of a criminal conviction is . . . uniquely difficult to classify as either a direct or a collateral consequence.").  Deportation is experienced as, and popularly understood to be, a form of punishment.  Indeed, the recognition of deportation as a punishment has deep roots that go back to the founding era. Thus James Madison expressly acknowledged the harsh punishment represented by deportation noting that ". . . if a banishment of this sort be not a punishment and among the severest of punishments, it will be difficult to imagine a doom to which the name can be applied." James Madison, "Report on the Alien and Sedition Acts," Writings at 623 (Library of America 1999, Jack N. Rakove, ed.). *See also INS v. Cardoza-Fonseca*, 480 U.S. 421, 449 (1987) ("[d]eportation is always a harsh measure"); *Costello v. INS,* 376 U.S.

120, 128 (1964) (deportation is a "drastic measure" where the "stakes are considerable for the individual"); *United States v. Fiswick*, 329 U.S. 211, 222n.8 (1946) ("Although deportation is not criminal punishment, it may visit great hardship on an alien. . ."); *Ng Fung Ho v. White*, 259 U.S. 276, 284 (1922)(deportation may "result . . . in loss of both property and life; or of all that makes life worth living); *Lok v. INS*, 548 F.2d 37, 39 (2d Cir. 1977)(deportation recognized as "a sanction which in severity surpasses all but the most Draconian criminal penalties").

The potential harm from deportation should not go unnoticed in crafting an appropriate sentence. Indeed, in *U.S. v. Chin Chong*, the Court stated that:

> A court tasked with imposing a sentence that "provide[s] just punishment" is
> obliged to consider whether the defendant is likely to face deportation. This may
> require—as it does in the present case—a lesser term of imprisonment for
> noncitizen defendants than otherwise would be appropriate.

*United States v. Chin Chong*, No. 13-CR-570, 2014 WL 4773978, at *7 (E.D.N.Y. Sept. 24, 2014).

Hyung Kim will face mandatory deportation if the crime for which he is convicted – failing to file an FBAR -- is held to be an "aggravated felony" under 8 U.S.C. §1101(a)(43)(M)(i) (crime involving fraud or deceit for which the loss to the victim(s) exceeds $10,000). *See, e.g., Lopez v. Gonzales*, 549 U.S. 47 (2006) (conviction of an aggravated felony bars a non-citizen from virtually all forms of relief from removal). While Congress has expressly provided in 8 U.S.C. §1101(a)(43)(M)(ii) that conviction under 26 U.S.C. §7201 (tax evasion) with an associated tax loss of $10,000 constitutes an aggravated felony, the government has succeeded in having another tax offense, 26 U.S.C. §7206 (filing materially false tax return) classified as an aggravated felony under M(i) where the revenue loss exceeded $10,000.

*Kawashima v. Holder*, 565 U.S. 478 (2012)

Although Hyung Kim will naturally argue that his conviction for failing to file an FBAR does not involve fraud or deceit, this is an issue that has yet to be decided and whose ultimate outcome cannot be predicted with certainty. In this connection, Justice Alito's concurrence in *Padilla*, 559 U.S. at 380-81 aptly notes the difficulty in determining whether an offense constitutes an aggravated felony and agrees with the proposition that as far as immigration is concerned nothing is ever simple. More recently in *Matter of Jasso Arangure*, 27 I & N Dec. 178, 182 (BIA Dec. 29, 2017) the Board of Immigration Appeals itself recognized the inherent complexity in an aggravated felony determination holding that "[w]hether a particular offense is an aggravated felony is a legal determination affected by complex laws that are in constant flux." Especially given the monetary amounts in this case, United States Immigration & Customs Enforcement ("USICE") may very well take the position that even failure to file an FBAR is a crime involving fraud or deceit and therefore an aggravated felony which would subject Hyung Kim to deportation. In this regard, it is noteworthy that the Bureau of Prisons ("BOP") categorically assumes that all non-citizens in its custody are deportable. BOP Program Statement 5100.8 - Inmate Security Designation and Custody Classification (2006) at Chapter 5, Page 9 (defining a "Deportable Alien" as "a male or female inmate who is not a citizen of the United States").

Once USICE decides to place Mr. Kim in removal proceedings based upon an aggravated felony charge, mandatory detention would apply under 8 U.S.C. §1226(c), which means that Mr. Kim would be held by in custody by USICE without bond during the pendency of removal proceedings, which can be protracted as they proceed from the Immigration Court, to the Board of Immigration Appeals and to the appropriate United Sates Court of Appeals for judicial review. *See Demore v. Kim*, 538 U.S. 510 (2003), which upholds the constitutionality of mandatory

detention. In other words, irrespective of this Court's sentence, Mr. Kim faces additional

imprisonment by USICE even after the completion of any custodial sentence this Court may

impose and would face such risk even if the Court does not sentence him to

prison.[5].Furthermore, this additional imprisonment can be lengthy. Recent data from the

Executive Office for Immigration Review demonstrates that this detention can be prolonged.

From 2003 to 2015, 32,654 people in such removal proceedings were detained for over six

months, 10,027 were detained for over year, and 2,123 were detained for two or more years..

Furthermore, the average detention time when cases are appealed has approached a year, 336

days in 2001, and 313 days in 2015.[6]

     Moreover, any incarceration would most likely not be in the federal prison system, and

bail will not likely be available.  USICE frequently detains non-citizens in county jails and the

length of that detention "alongside those serving terms of imprisonment as a penalty for their

crimes" supports the concern expressed by the Third Circuit in Chavez-*Alvarez v Warden York

Cnty Prison*, 783 F.3d 469, 478 (3rd Cir. 2015) about the reality "that merely calling a

confinement 'civil detention' does not, of itself, meaningfully differentiate it from penal

measures. *Accord Ngo v. INS*, 192 F.3d 390, 397-98 (3d Cir. 1999) ("It is. . . unrealistic to

believe that. . .INS detainees are not actually being 'punished' in some sense for their past

conduct"). While the issue of constitutional limits upon mandatory detention under 8

---

[5] While a sentence of imprisonment would most quickly bring Mr. Kim to the attention of  USICE, which monitors federal prisons for non-citizens, he would also come to the attention of USICE when he went to renew his alien registration receipt card ("green card"), a procedure that requires him to be fingerprinted, or whenever he had to travel outside the United States on business. *See Vartelas v. Holder*, 132 S.Ct. 1479 (2012)(returning resident who commits offense after April 1, 1997 is subject to charge of inadmissibility). In short, Mr. Kim cannot realistically escape the possibility of imprisonment by USICE.

[6] Executive Office for Immigration Review, Certain Criminal Charge Completion Statistics (Aug. 2016), https://www.justice.gov/sites/default/files/pages/attachments/2016/08/25/criminal-charge-completopn -statistics-201608.pdf.

U.S.C.§1225(c) without a bond hearings is now before the Supreme Court in *Jennings v. Rodriguez*, Sup. Ct. Dkt. No. 15-1204 (reargued on October 3, 2017), the most liberal view that any Court of Appeals has adopted to date on this issue is that a detained non-citizen must be given a bond hearing after being detained for six months. *See, e.g., Lora v. Shanahan*, 804 F.3d 601 (2d Cir. 2015).

In the event that Hyung is deported, the consequences on him, his family, and his business interests will be catastrophic, especially since deportation for conviction of an aggravated felony has been recognized as a sentence of lifetime banishment. *Steele v. Blackman*, 236 F.3d 130, 134 (3d Cir. 2001).

As noted earlier, Hyung immigrated to the United States over two decades ago to start a new life for himself and his family. In doing so, he moved the proceeds from the sale of his father's businesses in 2009 – over $30 million – to the United States and used those funds to develop successful businesses in the United States.

His children were educated in the United States and his wife of 37 years is a U.S. citizen.. He is expecting his second grandchild who will be born in the United States and will most likely be raised in the United States. If Hyung were to be deported from the United States, he would be forced to live away from his wife, daughter and grandchild. Also, depending on which country he chooses to live in, he would be further away from his son and grandson.

Moreover, if Hyung were to be deported, the financial consequences on him and his businesses will be catastrophic. His businesses will have to be run without his vision, leadership, and management. As noted earlier, his businesses generate significant revenue and employ thousands. We urge the Court to consider the collateral personal and business costs of his deportation versus the benefit of having Hyung's continued presence in the United States as well

as the fact that removal proceedings alone carry with them the risk of imprisonment in USICE custody. If Hyung loses his permanent resident status and lives in a foreign country, he would stop paying U.S. taxes, income or estate. He would be painfully separated from his family, and his businesses would suffer, disrupting the lives of many innocent parties.

      b.        *The* U.S. v. Gabella *precedent suggests a sentence of probation in this case is appropriate*

Research shows that there were three permanent residents who have pled guilty to failing to file an FBAR. It is noteworthy none of the permanent residents were sentenced to federal prison. *See U.S. v. Gabella* (one count failure to file FBAR, guidelines offense level 17, no 5K, sentenced to three years' probation); *U.S. v. Hoess* (one count failure to file FBAR, guidelines offense level 19, 5K received, sentenced to 8 months home detention and three years' probation); and *U.S. v. Reiss* (one count failure to file FBAR, guidelines offense level 19, no 5K, sentenced first 8 months in community confinement center and 3 years' probation).

The most analogous case with a publically available record is *U.S. v. Gabella*. In *U.S. v. Gabella*, Mr. Gabella, an Italian citizen and a lawful permanent resident of the U.S., pled guilty to an information charging him with a single count of failing to file an FBAR for 2007 in violation of 31 U.S.C. §§ 5314, 5322(a) on June 18, 2014 at the United States District Court, Eastern District of New York.

The similarities between Mr. Gabella and Mr. Kim are striking. ;

- Both pled guilty to failing to file an FBAR;

- Both paid millions of dollars in FBAR penalties;

- The tax loss/restitution amount for Mr. Gabella placed him at level 17 while the tax loss/restitution amount for Mr. Kim places him at level 15;

- Both accepted responsibility early; and

- Most significantly, as a permanent resident, Hyung Kim, like Mr. Gabella, is subject to the prospect of deportation. He is subject to being placed in removal proceedings after his sentencing becomes final.

One important factor relevant to sentencing, however, distinguishes Mr. Gabella's case from Hyung Kim's case. Hyung Kim will be receiving a 5K letter from the Government whereas Mr. Gabella did not receive one. Mr. Gabella was sentenced to a term of three years of probation and fined $50,000. The rationale for a sentence of probation (as opposed to incarceration) is documented in the Statement of Reasons for Sentencing, wherein Judge Jack Weinstein wrote:

> Upon section 3553(a)(2)(B) of Title 18, a sentencing court must consider two major factors: general and specific deterrence. The prospect of deportation was considered in Gabella's sentencing. See United States v. Chin Chong, No. 13-CR-570, 2014 WL 4773978, at *13 (E.D.N.Y. Sept. 24, 2014).

> In light of Gabella's cooperation and the fact that Immigration and Customs Enforcement will be informed of the crime to which he pled guilty, Gabella was sentenced to a term of three years of probation and fined $50,000. 18 U.S.C. § 3561(c)(1); U.S.S.G. § 5E1.2(c)(3).

*U.S. v. Gabella*, No. 1:14-cr-000207-JBW, Dkt. #17, p.4 (E.D.N.Y. Dec. 22, 2014).

As noted above, Hyung's cooperation resulted in a 5K motion. Hyung Kim pled guilty to the exact same offense as Mr. Gabella, making him susceptible to deportation just like Mr. Gabella. It is respectfully submitted that Mr. Gabella's sentence is a compelling precedent for a sentence of probation.

## III.     The Kinds of Sentences Available

This Court has the authority and may exercise its discretion to consider a wide range of alternatives to the lengthy term of imprisonment that is called for under the Guidelines. 18 U.S.C. §§ 3553(a)(3) and 3561(a)(1). In fact, § 3553(a)(3) specifically directs consideration of sentences *other than* imprisonment.

*a.     A Sentence of Probation is Appropriate*

A probationary sentence here, which we recognize would be a variance from a strict application of the guidelines, would be fully justified in this case on four grounds.  First, as we discussed above, a variance from the guidelines range as calculated in the PSR is justified based on the joint recommendation by the government and the defendant in light of the previous consistent interpretation of the guidelines in these offshore cases.  Second, as we will describe below in Section VI concerning the avoidance of sentencing disparities, dozens of federal district courts have sentenced defendants to probation (often including a period of home confinements and/or community service) in offshore cases where the defendant engaged in similar, or even identical conduct as Hyung.  Third, a number of defendants have received sentences of probation after demonstrating characteristics and circumstances similar to a number of those present in this case.  *E.g.*, *Howe*, 543 F.3d at 130-31 (affirming below guideline sentence of probation and home confinement on wire fraud convictions); *United States v. Moore*, 344 F. App'x. 767, 768-69 (3d Cir. 2009) (affirming sentence of probation and home detention on tax evasion conviction despite guideline range of 18 to 24 months based on defendant's lack of criminal history and cooperation with the government). These cases are illustrative of many others that have imposed sentences of probation with home confinement, including for the same crime Hyung has pleaded guilty to, as detailed further elsewhere in this Memorandum.  Lastly, the prospect of incarceration of unknown length and deportation is another factor that would warrant a sentence of probation in this case with a long-term U.S. lawful resident with a U.S. citizen family.

## IV.     The Sentencing Guidelines

Notwithstanding the guideline calculation in the PSR, for the reasons indicated above and in the plea agreement in this case, both the government and defendant recommend that the court approve the guidelines calculation as reflected in the plea agreement which results in a range of

from 18-24 months.  If the Court accepts this joint recommendation, it could adopt the 18-24 month range by virtue of a variance.  Additional comments on the guidelines are included in the discussion of sentencing disparity below.

**V.    Pertinent Policy Statements**

There are no pertinent U.S. Sentencing Commission policy statements.

**VI.    The Need to Avoid Unwarranted Disparities among Similar Offenders**

Hyung's case is part of an aggressive nine-year IRS/DOJ program to pursue tax offenders who have used offshore accounts to conceal funds.  More than 130 individuals have been charged as a part of that program and approximately 85 have been sentenced as individuals where the utilization of an offshore account constituted the primary issue.[7]  These cases invariably involve significant tax loss and multi-million dollar foreign accounts.  Sentencing judges in these offshore cases have imposed sentences with downward variances in unusually high volumes – in 99% of the cases – even where there is no 5K motion.  Even in the one exception defense counsel located, the defendant was prohibited from asking for a variance because he signed a binding plea agreement mandating a sentence at the bottom of the guideline range.  The variances in offshore cases are often substantial, averaging a reduction of over 83% from the bottom of the guideline range.[8]  The most common sentence, by far, has been probation, which has occurred in *55% of all cases*, in many instances with a combination of home confinement and/or community service.  In cases, such as this one, that involve the issuance of a 5K motion, periods of incarceration are even rarer, and variances are even more robust.  As has

---

[7] This does not include defendants who were bankers or other professionals.  The sentencing data in this section of the brief is derived primarily from DOJ website information, a private website that track's offshore sentencing data, data supplied by a sentencing consultant with access to the Sentencing Commission's databases and various court filings.

[8] One reason for the relatively high percentage variance is the number of cases where the ultimate sentence is probation, yielding a variance of 100%.

occurred in this case, these variances may reflect, in part, the high financial (FBAR) penalties imposed by the government, the over 55,000 individuals with similar conduct in voluntary disclosure programs, and the defendant's cooperation.

It is entirely appropriate for the Court to look to sentencing in similar cases and to note when those cases have consistently imposed sentences below the guidelines' range including sentences of probation. *United States v. Groos*, No. 06 CR 420, 2008 WL 5387852, at *7-8 (N.D. Ill. Dec. 16, 2008) (looking at other cases and sentencing defendant to 60 days imprisonment despite guideline range of 24 to 30 months); *see also United States v. Doan*, 498 F. Supp. 2d 816, 820 (E.D.Va. 2007) ("This Court does not dispute the value in looking nationwide to similarly situated criminal defendants of similar culpability that have committed similar acts resulting in similar convictions with similar backgrounds and with similar records under similar circumstances.").

In fact, given the prevalence of probationary sentences in offshore cases viewed in the context of Hyung's potential deportation, we suggest that imposing a custodial sentence would create an unwarranted disparity in sentencing. As the Eastern District of New York ruled in *United States v. Chin Chong*, "the fact that the noncitizen defendant may receive a sentence less than the citizen defendant may seem counterintuitive, but…the two are not similarly situated. To the contrary, noncitizens face radically different outcomes as a result of their convictions." No. 13-CR-570, 2014 WL 4773978, at *10 (E.D.N.Y. Sept. 24, 2014).

The government will no doubt point to the concededly large size of Hyung's account and the significant and continuing efforts at concealment as a reason for the court to impose some incarceration, but that ignores several mitigating factors that we submit more than compensate for this fact. First, as was detailed *supra* and in the sealed filing, Hyung provided the

government with extensive cooperation spanning a five year period.  In the cases we have identified where a 5K motion was filed, sentences of probation are the standard, occurring in 67% of all cases, and even when periods of incarceration are called for, they are often exceedingly short with 80% of sentences including two months of jail time or less.  In total, we have identified sixteen cases where a 5K motion was filed and the sentencing guideline range was 18-24 months or below (as is the case for Hyung).  In twelve of those cases the court issued a probationary sentence, and in every case the defendant received two months of jail time or less.[9]

In most cases involving cooperation, the cooperation appears to be less significant than that provided by Mr. Kim; many appear to be based on providing information in interviews and offers to testify if needed.  For example, Steven Michael Rubenstein was sentenced in the Southern District of Florida to 3 years' probation along with a year of home confinement.  Mr. Rubenstein had an advisory guideline range of 18 to 24 months just as in this case, and the government issued a 5K.  Mr. Rubenstein provided "information to the government about his involvement, and the involvement of other in a tax evasion scheme" that he learned of through his banking relationship with UBS.  Mr. Rubenstein was also involved in undisclosed ongoing cooperation at the time of sentencing.  But what Mr. Rubenstein did seems to pale in comparison to the five year span of cooperation that Hyung provided for the government, the details of which are provided under seal.

Second, Hyung has made an extraordinary level of restitution to the treasury, paying an FBAR penalty in excess of $14,000,000 as a stipulation of his plea agreement.  As indicated

---

[9] In addition, we have not been able to find any cases where the government requested 9 months incarceration or less, pursuant to a 5K motion, and the defendant was sentenced to more than a month in prison.

above, this financial penalty is over 57 times the tax loss in this case. Sentencing guidelines in tax cases are connected to the size of the tax loss to the government, not the size of the account. The account size determines the FBAR penalty, and Courts have considered the magnitude of this penalty as additional punishment and a mitigating factor at sentencing.

The clearest example of this can be found in the prosecution of Ty Warner in the Northern District of Illinois. Mr. Warner was prosecuted for an undisclosed offshore bank account that had a high balance of over $100,000,000. Varying from a guideline range of 57-71 months, the Court imposed probation, primarily on Mr. Warner's charitable activities, but it also noted that he had already "been punished…severely" by paying the "largest fine in history." Notably, the Warner case involved no 5K motion.

As explained above, probationary sentences, such as in the Warner case, are common in the sentencing of offshore cases. For example:

- Andrew Silva, Eastern District of Virginia, Case No. 10-CR-00044, before Judge Liam O'Grady. Repatriated funds from his undisclosed offshore account by mailing himself 26 packages of currency and carrying another two packages into the United States, always structured in amounts under $10,000 to avoid detection. Sentenced to 2 years' probation, 4 months' home detention, and 100 hours of community service.

- Albert Cambata, Eastern District of Virginia, Case No. 15-CR-362, before Judge Claude M. Hilton. Received $12 million from a Belizean company which was deposited into an undisclosed account at a Swiss bank in the name of Hong Kong Corporate entity. Funds were later transferred to a Singapore and Monaco bank account and Cambata neglected to file FBARs or Forms 8938 even after he was advised to do so by counsel. Sentenced to 1 year probation and a $15,000 fine.

- Mary Estelle Curran, Southern District of Florida, Case No. 12-80206-CR-RYSKAMP. Owned an undisclosed $47 million Swiss bank account which resulted in a $21 million FBAR penalty. Sentenced to *five (5) seconds* of probation.

- Igor Olenicoff, Central District of California, Case No. 07-CR-227. Controlled and hid assets in undisclosed foreign accounts resulting in tax liability to the IRS totaling $52 million. His offshore accounts contained approximately *$200 million dollar*. Sentenced to two years' probation.

- Juergen Homann, District of New Jersey, Case No. 09-CR-724. Placed $5 million in an offshore account with UBS resulting in a guideline range of 30 to 37 months. Court was impressed with Homann's cooperation in providing information on individuals not previously known to the government and granted a substantial downward departure, sentencing defendant to 5 years' probation and 300 hours of community service.

- Ashvin Desai, Northern District of California, Case No. 11-CR-846. Hid over $8.4 million in an HSBC India account. Case went to trial, sentencing guidelines called for a sentence between 78-96 months. Judge granted a 72 month variance and sentenced defendant to 6 months in prison and 6 months of home detention.

- Paul Zabczuk, Southern District of Florida, Case No. 10-CR-60112. Directed his foreign clients to make payments to his company through offshore accounts he controlled in the Bahamas and Switzerland and further funded those offshore accounts through other payments. Court granted 5K1.1 motion to depart down six months. Court varied down another 18 months and sentenced defendant to 3 years' probation, 12 months' home detention, 150 hours of community service.

- Steven Rubinstein, Southern District of Florida, Case No. 09-CR-60166. Hid approximately $7 million in undisclosed UBS accounts he used to purchase real estate and South African Kruggerands. Sentenced to 3 years' probation, 12 months' home detention.

- Arvind Ahuja, Eastern District of Wisconsin, Case No. 11-CR-135. Convicted in jury trial of willfully filing a false return and willfully failing to file an FBAR due to a failure to disclose more than $8.5 million held in bank accounts at HSBC India. Court varied from a guideline range of 41-51 months to a sentence of 3 years' probation, 3 months home detention, a $350,000 fine, and 450 hours community service.

- Sybil Nancy Upham, Southern District of New York, Case No. 14-CR-82. Unreported accounts at UBS and in a Liechtenstein foundation. Court granted a 5K1.1 motion and Court varied from a guideline range of 30-37 months to a sentence of 3 years' probation and 300 hours of home detention.

- Jules Robbins, Southern District of New York, Case No. 10-CR-333. Created a sham Hong Kong Corporation to be listed as the nominal holder of his UBS accounts containing nearly $42 million. Sentenced to 12 months' probation.

- Ernest Vogliano, Southern District of New York, Case No. 10-CR-00327. Opened UBS accounts in the names of Liechtenstein and Hong Kong shell corporations. Actively used funds and transferred some after learning of the criminal investigation. Sentenced to 2 years' probation.

- Leonid Zaltsberg, District of New Jersey, Case No. 10-CR-437. Transferred his UBS accounts to a nominee Panamanian corporation for the purpose of hiding them from

the IRS and, as found by the District Court at sentencing, "made a conscious and calculated decision to hide money offshore."  Sentenced to 4 years' probation, 12 months' home detention.

- Jeffrey Chatfield, charged in the United States District Court for the Southern District of California, Case No. 10-CR-4546.  Held UBS account in the name of a nominee entity.  Sentenced to 3 years' probation.

As one would expect in a set of cases with relatively low sentences, those defendants who have earned 5K cooperation motions from the government likewise receive sentences with significant variances/departures from the guideline range applicable in the case.

- Dan Horsky, Eastern District of Virginia, Case No. 16-CR-00224, before Judge T.S. Ellis, III.  Placed $220 million worth of investments in a nominee tax haven entity with a Swiss bank account and routed transfers through conduit accounts to shield them from U.S. detection.  Repatriated some of the funds to the US while concealing his ownership.  Later further shielded his ownership by placing the account in the name of a nominee owner.  Although the sentencing guideline range was 57-71 months, defendant sentenced to 7 months in prison and a $250,000 fine.  Judge cited, among other things, Mr. Horsky's extensive proactive cooperation for the substantial downward departure.

- Moshe Handelsman, Northern District of California, Case No. 13-CR-00384.  Transferred funds from U.S. business to his own undeclared offshore accounts and reported fraudulent deductions by claiming that the transfers were payments for information from unaffiliated foreign entities.  Cooperated with the government to describe his own behavior as well as that of his return preparer and UBS, and acted as a key witness against his former accountants. Although the sentencing guideline range was 30-37 months, the defendant was sentenced to 2 years' probation and $6,000 fine. Judge mentioned that absent cooperation he "would not be in this [sentencing] range at all."

- Paul Zabzcuk. Southern District of Florida, Case No. 10-CR-60112, defendant participated in a false invoicing scheme to move money offshore unreported, and use the money to purchase antiques in China which were in turn brought back into the United States.  After being rejected from OVDP, immediately provided information to the government about others involved in the scheme as well bankers and the bank itself.  Guideline range was 24-30 months but the defendant was sentenced to 3 years' probation and 12 months home detention.

- John McCarthy, Central District of California, Case No. 09-CR-784.  Transferred over $1 million to an undisclosed UBS account and regularly communicated with UBS representatives to authorize transactions.  Court accepted 5K1.1 motion for downward departure.  Sentenced to 3 years' probation, 6 months' home detention, and 300 hours of community service.

## VII. The Need to Provide Restitution to Any Victims of the Offense

The only victim in the case, the United States Treasury, will have been paid full restitution with interest prior to sentencing.

## VIII. A Sentence of Probation is Appropriate

The Supreme Court has said that "the punishment should fit the offender and not merely the crime." *Pepper*, 131 S.Ct. 1at 1240 (internal quotations omitted). There are many ways a defendant is punished, and this Court will ultimately decide the appropriate punishment in this case.

Hyung has, to some great extent, been punished already. Aside from the extraordinary financial sanctions here, Hyung and his family have been waiting for over five years after his decision to plead guilty. The case has received significant attention in the Korean-American press in the New York metropolitan area and websites. The publicity from his guilty plea has been a matter of significant humiliation for him, but has already provided a significant deterrence impact for the US government in the large Korean-American community in the US.

Hyung Kim is paying dearly for his mistakes and will continue to do so for the rest of his life. Hyung does not seek to diminish the gravity of his conduct, but he respectfully asks the Court to consider all of the facts above – not only his criminal conduct in establishing and concealing accounts that compounded itself over the years, but an otherwise lawful and productive life, his extraordinarily high penalty payments and his cooperation, business life and foundation work.

We respectfully suggest that a sentence of probation is warranted here by (i) Hyung's payment of extremely high financial penalties and restitution in excess of $14 million; (ii) his early offer to plea and extensive cooperation with the government detailed in sealed filings by

both the Department of Justice and the defendant; (iii) his otherwise exemplary life and contributions as an employer and through his generosity; (iv) issues related to possible deportation and attendant extended incarceration; and (v) the sentences being imposed by the majority of courts on similarly situated defendants. It is also justified by his character, as reflected in the letters submitted to the Court.

## **CONCLUSION**

Based upon the information contained in this memorandum, we respectfully ask the Court to sentence Hyung Kim to a term of probation.

Dated: January 19, 2018              Respectfully submitted,

                                __/s/ Matthew C. Hicks_____
                                MATTHEW C. HICKS
                                Virginia Bar Number 48377
                                MARK E. MATTHEWS
                                CAPLIN & DRYSDALE, CHTD.
                                One Thomas Circle, N.W., Suite 1100
                                Washington, D.C. 20005
                                Telephone: (202) 862-7852
                                Facsimile: (202) 429-3301
                                E-Mail: mhicks@capdale.com

                                *Attorneys for Hyung Kwon Kim*

**CERTIFICATE OF SERVICE**


I certify that on January 19, 2018, I filed the foregoing Defendant's Sentencing Memorandum in

Support of a Sentence of Probation with the Clerk of Court using the CM/ECF system, which

will serve notice of this filing on all parties registered to receive such notice, including the

United States of America. A copy will also be delivered to the following:


Karen Riffle
Supervising  U.S. Probation Officer
Eastern District of Virginia
Email: *Karen_Riffle@vaep.uscourts.gov*


__/s/ Matthew C. Hicks_____
MATTHEW C. HICKS
Virginia Bar Number 48377
CAPLIN & DRYSDALE, CHTD.
One Thomas Circle, N.W., Suite 1100
Washington, D.C. 20005
Telephone: (202) 862-7852
Facsimile: (202) 429-3301
E-Mail: mhicks@capdale.com