IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | Case No. 1:17-CR-00248 |
| | ) | |
| HYUNG KWON KIM, | ) | Honorable T. S. Ellis III |
| | ) | |
| Defendant. | ) | Sentencing:  January 25, 2018 |
| | ) | 4:00 p.m. |

POSITION OF THE UNITED STATES WITH RESPECT TO SENTENCING

The United States hereby submits its position on the sentencing of the defendant Hyung Kwon Kim ("defendant" or "Kim") in accordance with U.S.S.G. §6A1.2 and the policy of this Court. As explained below, while the government agrees with the Probation Office's calculation of the sentencing range the advisory Sentencing Guidelines, the government nevertheless believes that the appropriate Guidelines range that should be applied in this case is that agreed upon by the parties, as set forth in the plea agreement. Taking into account the factors set forth in 18 U.S.C. § 3553(a) and the government's filing under seal, the government makes a final sentencing recommendation of nine (9) months of imprisonment, three (3) years of supervised release, an appropriate fine, and a $100 special assessment.

**I.     Background**

   **A.     Offense Conduct**

Hyung Kim is a highly educated and sophisticated executive. Born into affluence, he had the good fortune to inherit staggering sums. The vast sums Kim secreted in a series of secret Swiss accounts are of import here. At one point, in 2004, the windfall stashed in Switzerland

swelled to over $28 million.  Kim engaged in a series of schemes and ruses to conceal the funds from the IRS, violate reporting requirements, and evade taxes.

Kim first opened an account in his own name at Credit Suisse AG in Switzerland in October 1998.  He funded that account, as well as other additional accounts that he opened at Credit Suisse, its wholly owned subsidiaries (including Bank Leu, Bank Hofmann, and Clariden Leu), and UBS AG, with funds inherited from a foreign relative.

In November 2000, Kim took the first of many steps to mask his ownership and control of the offshore funds.  At the advice and with the assistance of his co-conspirator Edgar Paltzer, an attorney practicing in Switzerland, Kim opened an account at Bank Leu in the name of a sham entity called Daroka Overseas.  In February 2002, he opened a second account, at Bank Hofmann, in the name of the same entity.   By placing his assets in accounts held in the name of a nominee, Kim made it appear that the offshore funds belonged to a corporate entity, not him.

Kim controlled the assets in the account by meeting with the bankers and his attorney in in Switzerland and the United States as well as communicating with them via email, fax, and phone.  Further, he hosted one of his Swiss bankers at his homes in the U.S. where the banker vacationed with his family and used Kim's residence as a base to travel to meet with his other clients.

Wires from afar flowed into these accounts.  By the close of 2004, the balance of his accounts exceeded $28 million.  Kim did not expend these funds on necessities.  Instead, Kim used assets in the accounts to fund a lavish lifestyle. The Statement of Facts and PSR discuss Kim's expenditures in detail.  However, a summary of the spending is helpful to understand the magnitude of the wealth that Kim concealed:

- Between 2003 and 2007, Kim spent over $3 million from his Swiss accounts to purchase his residence in Greenwich, Connecticut. Kim and Paltzer took efforts to conceal that Kim controlled the funds in the Swiss accounts. When Kim communicated with Paltzer, he used coded language. In turn, Paltzer directed Credit Suisse to issue a check for $1.76 million from Credit Suisse First Boston, its U.S. bank, so that it appeared that Kim tapped a domestic source of funds.

- In 2005, Kim spent almost $5 million from his Swiss accounts to purchase a summer home on Cape Cod. While the price was significant, what is most relevant are the machinations undertaken by Kim and Paltzer to conceal Kim's ownership of the Swiss accounts and the summer home itself. Paltzer formed a new sham entity, Edraith Invest & Finance, to hold title to the home as well as a Swiss account. Paltzer and Kim pretended that Kim merely leased the home in an arms-length transaction from a third party. They drafted and executed fake leases. They exchanged emails in which they discussed the wishes of the "owners."

- Between 2003 and 2008, Kim used over $5 million from his Swiss accounts to purchase jewels and jewelry, including the following items: a 11.6 carat diamond ring; a 10.5 carat yellow diamond ring and jewelry setting; a 8.6 carat ruby ring; a 8.4 carat emerald ring; a 7.15 carat diamond ring; and pearls.

- Between 2000 and 2008, Kim withdrew over $500,000 when traveling in Switzerland to fund his personal expenses.

Kim had the opportunity to bring his remaining assets to the United States in 2008, in the midst of the Department of Justice's investigation of UBS AG for aiding and assisting U.S. taxpayers to evade their taxes. At that time, Credit Suisse had advised Paltzer and Kim that it

intended to close the Daroka Overseas and Edraith accounts as part of its initiative to minimize the bank's exposure by closing accounts held by U.S. residents in the names of nominee entities. Fully aware that Kim's undeclared assets could not stay at Credit Suisse, Paltzer and Kim reviewed Kim's options: to report his previously undeclared assets and income to the IRS; to end his crimes by spending the assets; or to continue the concealment by transferring his assets to another bank. Kim chose to keep the money offshore, albeit at Bank Frey, a smaller Swiss bank that considered itself immune from U.S. law enforcement as it deliberately maintained no physical presence in the United States.[1]

With the assistance of Paltzer, Kim opened accounts at Bank Frey in the names of Daroka Overseas and Edraith in December 2008. He deposited into those accounts the remaining assets from his accounts at Credit Suisse's subsidiaries. Paltzer advised Kim to take further precautions to prevent detection, by limiting emails and phone communications from the U.S. and meeting in third countries, such as France or Italy.

Kim maintained the accounts at Bank Frey until 2011. At that time, he elected not to report the funds, but to bring the assets to the United States in a covert manner by paying a

---

[1] In September 2008, as corroborated by the Internet Wayback Machine, Bank Frey's web site contained the following statements:

> "An important reason for founding Bank Frey was to provide our clients with the services of a Bank that is - and always will remain - truly Swiss," Dr. Markus A. Frey says.
>
> As a result, Bank Frey follows a strict policy to never open any branch or other representation outside the reach of the Swiss laws and jurisdiction. We strongly believe that only by remaining a true Swiss banking institution, we can guarantee to act in accordance with the Swiss standards of political stability, acting in good faith and an unbroken sense for independent neutrality.
>
> Dr. Markus A. Frey continues, "Bank Frey is and will remain truly Swiss. Only that way can we be certain to maintain our values - and assure that no foreign authority will ever 'bully' us into giving them up".

See "A True Swiss Bank", available at https://web.archive.org/web/20080915012232/http://www.bank-frey.com:80/index.php?option=com_content&task=view&id=27&Itemid=55. Bank Frey announced that it would cease operations in October 2013.

jeweler in Switzerland for jewels and jewelry purchased in the United States.  Kim arranged the sales by mailing packages of gifts to the children of his former banker.  Kim hid handwritten transfer instructions within those packages.  Between March and August 2011, Kim spent a total of $3.6 million in two separate transactions to purchase a ring with a sapphire weighing 13.9 carats and three loose diamonds weighing 5.02, 4.03 and 4.17 carats.

Kim concealed his offshore assets from his accountants.  Indeed, although the defendant filed FBARs in 2005, 2006, 2007, and 2008 (for calendar years 2004 through 2007) on which he reported accounts that he owned in South Korea, he never once reported his Swiss accounts.  Further, Kim also filed false income tax returns on which he underreported his income and failed to report his ownership of the Swiss accounts.

Kim did not earn substantial amounts of taxable income from the assets in the Swiss accounts.  From 2001 through 2010, the combined federal and state income tax loss amounted to $243,542.  Indeed, the millions of dollars in capital losses that Kim incurred as a product of his ill-advised investing swamped his investment gains.

**II.     Sentencing Argument**

Although the Supreme Court rendered the federal Sentencing Guidelines advisory in *United States v. Booker*, 543 U.S. 220 (2005), "a sentencing court is still required to 'consult [the] Guidelines and take them into account when sentencing.'" *United States v. Clark*, 434 F.3d 684, 685 (4th Cir. 2006) (quoting *Booker*, 543 U.S. at 264).  The Supreme Court has directed district courts to "begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall v. United States*, 552 U.S. 38, 49 (2007).  The sentencing court, however, "may not presume that the Guidelines range is reasonable." *Nelson v. United States*, 555 U.S. 350, 352 (2009).  The "Guidelines should be the starting point and the initial

benchmark," but the sentencing court must also "consider all of the § 3553(a) factors" in determining the appropriate sentence. *Id.*; *see also Clark*, 434 F.3d at 685. Ultimately, the sentence imposed must meet a standard of reasonableness. *See Booker*, 543 U.S. at 260-61.

### A. Guidelines Range

#### 1. The Applicable Guidelines Provisions

The defendant pled guilty to the willful failure to file an FBAR, in violation of 31 U.S.C. Sections 5314 and 5322. The offense of conviction in this case falls under U.S.S.G. § 2S1.3. The Probation Office calculated the Guidelines range under U.S.S.G. § 2S1.3(a)(2) (the "Part-S Guidelines"). See Presentence Investigation Report, ¶¶ 76-85. That provision includes a cross-reference to the theft and fraud Guidelines, and sets the base offense level as follows:

> 6 plus the number of offense levels from the table in § 2B1.1
> (Theft, Property Destruction, and Fraud) corresponding to the
> value of the funds, if subsection (a)(1) does not apply.

Probation calculated the base offense level as 28. Probation added 22 levels as it placed the "value of funds" at $28,151,724, the year-end value of the assets in the unreported accounts in 2004 (the highest year-end balance). *See* PSR, ¶¶ 65(j), 76; U.S.S.G. § 2B1.1(b)(1)(L) (more than $25 million).

The government contends, as does Probation, that two levels should be added as the defendant "committed the offense as part of a pattern of unlawful activity involving more than $100,000 in a 12-month period." See U.S.S.G. § 2S1.3(b)(2). The Application Note to § 2S1.3 defines a pattern of illegal activity as "at least two separate occasions of unlawful activity involving a total amount of more than $100,000 in a 12-month period, without regard to whether any such occasion occurred during the course of the offense or resulted in a conviction for the conduct that occurred on that occasion." Kim filed false FBARs on October 14, 2007 (for 2006) and again on March 27, 2008 (for 2008). On each FBAR, Kim failed to report that he owned and

6

controlled any of the financial accounts in Switzerland.  Kim also filed a false 2007 Individual Income Tax Return, Form 1040, on March 3, 2008, which omitted any income that Kim earned from the assets in his undeclared accounts in Switzerland.  Kim's attorneys calculated that Kim omitted $104,699 in ordinary income on the 2007 return.  The filing of two false FBARs and a false return within a 12-month period qualifies as a "pattern of unlawful activity" sufficient to trigger the two-level enhancement.

While 2S1.3 may be the proper Guideline, the government respectfully requests that the Court sentence the defendant under U.S.S.G. § 2T, the Tax Guidelines.  As stated in the Plea Agreement, "at the time that the defendant agreed to plead guilty, the Government consistently took the position with similarly situated defendants that the applicable Guideline was U.S.S.G. § 2T1.1 and § 2T1.4 due to the cross reference in § 2S1.3(c)(1)."[2]  Plea Agreement, Dkt. # 10, pp. 3-4.

In 2012, Kim and the government commenced plea negotiations with the defendant's counsel.  At that time, the government had entered into plea agreements with a number of several other legal permanent residents that required those individuals to plead guilty to FBAR charges, and not tax charges.  In each of those cases, the plea agreements specifically set forth a Guidelines calculation using the Tax Guidelines and not § 2S1.3.  After Kim and the government had reached an agreement in principle, the government continued to employ the Tax Guidelines in virtually every other FBAR case.  In order to ensure that this defendant receives equitable treatment, the government believes that the appropriate Guidelines which should be applied *in this case* are the alternative calculation under § 2S1.3(c)(1).

---

[2] U.S.S.G. § 2S1.3 states as follows: "If the offense was committed for the purposes of violating the Internal Revenue laws, apply the most appropriate guideline from Chapter Two, Part T (Offenses Involving Taxation) if the resulting offense level is greater than that determined above."

The base offense level for this offense is 16 pursuant to U.S.S.G. § 2Tl.l(a)(1) and § 2T4.1(F), because the tax loss exceeded $100,000.  The base offense level is increased by 2 levels, pursuant to U.S.S.G. § 2T1.1(b)(2), because the offense involved sophisticated means.  The defendant should receive a 3-level reduction for acceptance of responsibility resulting in a total offense level of 15.  The advisory range is 18 to 24 months of imprisonment and the fine range is $4,000 to $40,000.

    **B.  Section 3553(a) Factors**

        **1.  Nature and Circumstances of the Offense, History and Characteristics of the Defendant, and the Need for Just Punishment**

Tax evasion is a serious crime, and the use of offshore accounts by U.S. taxpayers to evade their income tax obligations directly affects the ability of the Treasury to raise funds for government expenditures.  In April 2016, the IRS estimated that for the years 2008-2010, the U.S. tax gap, which represented the total amount of U.S. taxes owed but not paid on time, was $458 billion, despite an overall tax compliance rate among American taxpayers of 81.7%.  *See* "Tax Gap Estimates for Tax Years 2008–2010," report by the IRS, *available at*: https://www.irs.gov/PUP/newsroom/tax%20gap%20estimates%20for%202008%20through%202010.pdf.  The IRS found that these updated "estimates suggest that compliance is substantially unchanged since last estimated for [tax year] 2006." *Id*. at 2.

What sets Hyung Kim apart from many other seemingly similarly situated defendants, is the level and duration of the deception he employed to hide his assets from the IRS.  For over a dozen years, the defendant employed a series of ever more aggressive schemes to conceal the windfall that he inherited.  Kim utilized nine different accounts at five Swiss banks to hide his assets.  For four of those accounts, the defendant used nominee entities, formed in Caribbean tax-haven countries, to add a further layer of protection.  The defendant and his co-conspirator,

Paltzer, used one of those entities, Edraith Invest & Finance, to deceive a realtor and other third parties involved in the purchase of his home on Cape Cod. They went so far as to concoct a ruse whereby Kim and Paltzer exchanged emails wherein they pretended that Kim was renting the home from another family.

Kim had numerous opportunities to report his accounts and come into compliance. Each time, he chose to continue his criminal conduct. From 2004 through 2008, Kim filed FBARs on which he reported his ownership of certain accounts in South Korea. In each of those years, he had the opportunity to come clean about his Swiss accounts. He could have informed his U.S. return preparers about the Swiss accounts and sought their advice for properly reporting the ownership of the accounts and the income that he received, and pay the tax due and owing. Kim stayed silent.

In the same year that he filed his last, false FBAR, Paltzer, Kim's Swiss attorney, presented to him the option to close the accounts and bring the money to the United States. Instead, Kim chose to burrow deeper into the darkness of offshore evasion. He moved his assets to a bank that touted itself as refusing to be "bullied" by a "foreign authority," such as U.S. law enforcement.

Kim kept the funds in Switzerland for almost three more years. He continued to conceal his accounts from his return preparer and never filed FBARs during those years. In 2011, Kim again had the option to come clean and report his offshore assets. Instead, he elected to spend down the assets. Through a series of messages hidden in packages mailed from the U.S. to his former banker in Switzerland, Kim arranged to close his account by using the remaining fund to buy yet more high-end jewelry.

Given the duration of the offense, the amounts involved, the defendant's knowledge of his duty to report his foreign financial accounts, and the myriad of schemes and lies that the defendant perpetrated, a sentence of incarceration is required in order to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.

### 2. The Need for Deterrence

Over the past decade, the government endeavored to crack down on the use of foreign financial accounts by U.S. citizens seeking to evade the payment of their taxes. The foreign banks and institutions are more likely to aid and assist the ultra-high net worth individuals, like the defendant, to evade their taxes. Such foreign institutional assistance makes these crimes more difficult to detect, investigate and prosecute. Further, prosecutions involving offshore accounts such as this one require the government to commit significant investigative and prosecutorial resources, and the IRS typically detects the criminal conduct well after the offenses have been committed. A sentence of incarceration and a strong message of general deterrence in this case is necessary to ensure that U.S. taxpayers do not use foreign financial accounts to evade their taxes.

The government concedes that the defendant will pay a great financial price for his crimes. He has already remitted over $14 million to the government as a civil penalty for his willful failure to report his foreign banks accounts. Nevertheless, the defendant should receive no mercy for paying over what amounts to slightly more than 7% of his current net worth. He had numerous opportunities to report his accounts, had access to seasoned professionals who knew how to do such reporting, and chose not do so. He has no one to blame but himself. Further, Kim would have owed the same civil penalty had he been audited, not prosecuted.

**C.    Fine**

The Guidelines instruct that "[t]he court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a). The Presentence Report states that Kim's assets exceed $200 million and he receives monthly cash flow of more than $450,000. As such, the government recommends that the Court impose a substantial fine.

**III.    Restitution**

Pursuant to 18 U.S.C. § 3663A, restitution is mandatory in this case, and the parties have agreed that the defendant should pay full restitution to the IRS. The government expects that by the time of sentencing the defendant will have filed amended federal and state income tax returns and directly paid over the tax due and owing as well as interest.

Nonetheless, the government respectfully requests that the Court order restitution to the IRS for the following years in the following amounts:  2003 – $93,223; and 2009 – $63,828.

**IV.     Conclusion**

Based on the foregoing, and for the reasons stated in the United States' sealed filing, the United States submits that a final sentence should be imposed of nine (9) months of imprisonment, three (3) years of supervised release, an appropriate fine, and a $100.00 special assessment.

Respectfully submitted,

Dana J. Boente
United States Attorney

By:     /s/
Mark D. Lytle
Assistant United States Attorney
Eastern District of Virginia
Counsel for the United States of America
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel.: (703) 299-3700
Fax: (703) 299-3981
Email: Mark.Lytle@usdoj.gov

By:     /s/
Mark F. Daly
Special Assistant United States Attorney
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel.: (202) 616-2245 (phone)
Fax: (202) 616-1786 (fax)
E-mail: Mark.F.Daly@usdoj.gov

Robert J. Boudreau
Special Assistant United States Attorney
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel.: (202) 616-3336 (phone)
Fax: (202) 514-0962 (fax)
E-mail: Robert.J.Boudreau@usdoj.gov

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 19th day of January, 2018, I electronically filed the foregoing Position of the United States With Respect to Sentencing with the Clerk of Court using the CM/ECF system which will send notification of such filing to all attorneys of record.

A copy has also been sent via email to:

> Karen Riffle
> Supervising United States Probation Officer
> Karen_Riffle@vaep.uscourts.gov

/s/
Mark F. Daly
Special Assistant United States Attorney

16184362 2